## IDAWA GOLD MINING CO. v. CAHILL et al.

### No. 393.

Circuit Court of Appeals, Tenth Circuit.

Sept. 9, 1931.

Harry L. Fisher, of Boise, Idaho (Vestal P. Coffin, of Boise, Idaho, and H. E. Wallace, of Salt Lake City, Utah, on the brief), for appellant.

Willard Hanson, Vere L. McCarthy, and Frederick C. Loofbourow, all of Salt Lake City, Utah, for appellees.

Before COTTERAL, PHILLIPS, and McDERMOTT, Circuit Judges.

COTTERAL, Circuit Judge.

This suit was brought by the Idawa Gold Mining Company against Archie L. Cahill, joined with Vere L. McCarthy and with Clifford Patten, the sheriff of Salt Lake county, Utah, to secure a decree awarding to the company the title to and possession of a certain quantity of high-grade, gold-bearing quartz ore, alleged to have been stolen by Cahill from the Belshazzar mine owned by plaintiff in the Quartzburg mining district, near Boise City, Idaho, and brought by him to Salt Lake City. It was alleged that the sheriff had taken the possession of the ore from Cahill for use in a prosecution against him for larceny. An injunction was also sought and granted against any dealing with the ore by the defendants except for that purpose.

McCarthy answered by a disclaimer of interest. Cahill later filed an answer and cross-complaint. The answer denied the ore was stolen by him, and alleged it was his property and was transported from Idaho to Salt Lake City by an employee of plaintiff. He admitted the arrest and the seizure of the ore, but alleged he had been acquitted of the criminal charge, the ore was held by the sheriff as his trustee, and McCarthy was his attorney. In the cross-complaint, he prayed that he be declared the owner of the ore, the bill dismissed, and the injunction dissolved.

After intermediate proceedings and a trial, the court rendered a decision in which the evidence was discussed and findings were made for the defendant. A decree was entered dismissing the bill and setting aside the injunction, at plaintiff's cost. The ore was or-

dered to be retained by the clerk pending an appeal.

Errors are assigned upon a refusal to enter a decree for the plaintiff at a hearing upon the bill and answer, the leave given to amend the answer, the findings of fact for the defendant, and the taxation of the costs to plaintiff on McCarthy's answer.

There was no error in the order entered on the bill and answer. The object of the hearing was to test the sufficiency of the answer. Even treated as a submission of the case under the former Equity Rule LX, an amendment of the answer was allowable. But Rule 19 of the Rules in force since 1912 authorizes amendments generally. And by Rule 30 an answer may be amended by leave of court, upon notice, so as to put any averment in issue, when justice requires it. The order was well within the discretion of the court. The costs were properly taxed on McCarthy's answer, as he had no interest in the property when the suit was commenced.

The only serious controversy arises on the facts in the case. This court is fully committed to the rule that in an equity case, which is tried de novo on appeal, the findings of the trial court should for obvious reasons be accepted, unless they disclose a serious mistake in estimating the evidence. But, after an attentive study of the evidence, we are convinced there was such mistake in this case. It arose mainly because of a deficiency found in plaintiff's proof, rather than a disbelief of its witnesses. Otherwise, we should be more inclined to accept the conclusions reached. We summarize the evidence, necessarily omitting minor details.

The plaintiff continuously operated the mine since 1924. The defendant was employed there from March to August, 1926, working in the tunnel and at raise 6, where high-grade gold ore was located, on both day and night shifts, sometimes alone at night. The main body of ore was found in the mine at that raise, near the point where the defendant quit work. Raise 1-A had not then been reached. It was later completed through an intermediate level, started from raise 2.

The defendant was arrested at the Wilson Hotel, in Salt Lake City, on July 23, 1929, when the officers seized the ore in question, consisting of sixteen pieces, weighing 16½ pounds, one of them 8 pounds, and a map of the mine.

The plaintiff's main witness, Ed N. Scott, gave an account of many intervening transactions with the defendant, which he continued pursuant to employment by the company. He had been a sheriff in Wyoming and Montana and was a miner of experience, more recently operating at Quartzburg and the Gold Hill Mine near the Belshazzar. He resided at Quartzburg, and the defendant at Placerville.

Scott's relations with the defendant began late in 1928, when in defendant's presence on a train he showed the conductor some ore specimens, mentioning one of wire silver he had sold at Denver. At Boise, on New Year's Day, the defendant joined him and Frank French, in the latter's car, said he was interested in the specimen buyer, and asked them to drive to a farmhouse near Nampa where he had pawned some ore. When they reached Nampa, he stopped to see a deputy sheriff who had worked at Belshazzar mine. At the farmhouse, defendant obtained a small bundle wrapped in a flour sack, containing a nugget worth about $400, which Cahill said he had bought from a man employed at Belshazzar. The rancher handed him a quart jar of fine ore, which the defendant said came from that mine.

A few days later, at Scott's home, defendant said he had discovered there, while on the night shift, a sort of kidney of high-grade ore, which he had covered up and could not remove without detection, but he had taken about $15,000 worth of the ore from the mine, and would give Scott one-half for his aid in selling it. He remarked Scott was a legitimate operator and could grind and sell the ore, and he (the defendant) was not a producer, as the assay office knew and he had a hard time trying to dispose of it. He called the jar of ore "Ballard's Eye Salve." Scott bought it, on instructions from Mr. Ballard, plaintiff's superintendent.

The defendant had pawned the large nugget recovered from the farmer and a smaller one and needed $300 to redeem them. He asked Scott if the Denver buyer would take them. Scott bought them for $525, first advancing the $300 for the redemption and later paying the balance, both with plaintiff's money.

Their dealings continued. On defendant's request, Scott met him at Kuch's cabin (then unoccupied) about a mile below Quartzburg, when he asked Scott if he could handle a few specimens. By agreement they met at Flemming's tunnel. Defendant produced a large piece of ore, which he called the "Big Boy," and two smaller pieces. Scott bought the smaller pieces for $200 obtained from plain-

tiff, and turned them over to plaintiff. He agreed to try to sell the "Big Boy." Some of the pieces were of a peculiar red color, which defendant explained was due to treating them with acid to destroy their identity.

Defendant related an incident at Idaho City. He always had a fellow to carry out the ore, but neither could dispose of it, as Ballard had caused him to be arrested and searched, and he made a "phony" bundle out of it and dropped it to two fellows (a good joke on Ballard), who picked it up and sold it at Baker, Or., where he realized $1,100 for it.

On March 4, 1929, defendant came to Scott's house at night, and asked him to get a lease on the Belshazzar mine, offering to give him the location of certain caches, where he could get out the ore. Scott offered him a lease, on authority from plaintiff's secretary, in order to discover where the ore was hidden. In July, 1929, defendant handed to Scott the "Big Boy" for sale to the Denver buyer. Later, he said he had about $4,000 worth of ore hidden in his woodshed. With a view to recovering that, Scott returned the "Big Boy," suggesting a sale at Salt Lake. Defendant proposed to dig it up, adding he wished to get in touch with the buyer. Scott said he might be in Denver. Defendant said they would go there if they could not locate him in Salt Lake, and he wished an acquaintance with him, so that, if Scott could not go, the defendant would deal with him. He offered Scott a decent cut out of the "stuff."

In the same month, defendant gave Scott a lot of ore to put through the assay office, adding he would bunch up the ore and redeem 48 ounces worth five or six hundred dollars he had pawned in a bank as security for a loan of $200. They arranged another meeting to make a "clean up," at the Lyndale rooms in Boise, where defendant said he could get the pawned ore. Later he introduced Scott to the banker, Mr. Fry, as Emmerson, his ore buyer from the Coast. Fry had sold the ore, but returned a small piece which was all he could recover. Defendant complained and said he did not want the ore scattered about, as it would come up as evidence against him, and he wanted to get it out of the country. Defendant then told Scott he got the ore at the mine when he was working, and he had three caches there. He again urged Scott to obtain the lease. Scott agreed and later gave defendant the map he had obtained from Mr. Ballard. Defendant marked the caches on the map.

Defendant told Scott to buy the railroad tickets for Salt Lake City, promising to repay him after a sale of the ore. He remained in the stateroom all the way. At Salt Lake City they went to the Wilson Hotel, Scott, at defendant's request, registering his name as R. R. Emmerson, and Cahill registering as P. J. Murphy. On the train, defendant had shown the ore in his grip to Scott. It was in several bundles wrapped in newspaper. He displayed a 2-pound piece and some smaller pieces, including that obtained from Fry. He said he got the former right next to the "Big Boy," and showed Scott on the map where one of the caches was located —raise 1-A, where a tamping stick would be found.

The transactions culminated in the arrest of the defendant and seizure of the ore and map in July, 1929, as noted at the outset.

Scott later visited the Belshazzar mine and found raise 1-A had been abandoned. He proceeded to 1-B and around the intermediate level and then down to 1-A, where he found the tamping stick and located the cache which defendant had described to him.

Meantime, in May and June, defendant wrote letters to Scott. They were dated at Butte, Mont., and related in part to his personal affairs. In the first, he referred to the lease and asked how much money or grease it would take to "skid this big bozo for 20 or 30 days," warning Scott not to tell the natives of him and saying if he wandered into that country Scott could hire him on a 50–50 proposition. He promised to return when he could get his money out of "Big Boy," referred to digging up $200 he had mentioned, and asked Scott to hold the dope, etc. In the second letter, he again inquired as to the terms of the lease, grease money, dope, getting $1,200 on "Big Boy," and the debt of $200, and suggested a meeting at Boise. In the third letter, he asked a loan of $100, promising his return to Idaho, referring to the proposition as worthwhile, and stating if Scott got the lease "I'm going to give some of them the toughest deal of their life. All but one as I told you before." In the last letter, he again asked Scott for the loan, threatening to curse him for not paying the few dollars owing by him, and promising to meet him at Boise, signing the letter "Lord Help Us."

Mr. Ballard had received an anonymous letter, disguised by printed characters, as follows:

"Butte, Mont. 4/30/29

"Mr. Ballard: ·

"Your friend Mr. A. L. Cahill is hear with a load of the yellow mettle. About six thousand dollars worth.

"You must be awful dumb. He got three thousand dollars worth from Murnan.

"And that cash under the house you found. That rock at Everts store three years ago was yours put in assit and rubber to chang collor.

"You are sure dumb."

An expert witness identified the letter as being in the handwriting of the defendant. Ballard had a prior conversation with defendant on one of the subjects there mentioned.

Witness Brassey related a conversation with the defendant when he said "he had a $2,000 nugget and it weighed 108 ounces and it was Belshazzar stuff," and he offered to show it at his house. The witness added, however, they had long been friends and he did not believe the statement.

Fry testified to the loan to defendant on **four** specimens of ore weighing 3 or 3½ pounds, as security, a sale of the ore for non-payment of the loan, and his inability to regain more than one piece. He said defendant introduced Scott as Emmerson and wanted the ore back, adding, in substance: "It may come up in evidence against me; I don't want the stuff scattered around."

The defendant testified in defense. He gave an account of acquiring the ore involved in the suit. He explained that Pat Flemming was an old prospector living on Granite creek between Placerville and Quartzburg and had nine quartz claims with some tunnels in them, located on the same side of the hill as the Belshazzar, but separated by a gulch. In August, 1917, Flemming intrusted the ore to him, saying if anything happened to him it was the defendant's ore. In the fall of 1928, he said to defendant: "If I bump off, that pay streak is yours." Defendant showed the ore to his wife and buried it in the cellar. There were 37 quartz specimens and about 40 ounces of placer nuggets. In 1921, defendant sold four pieces for $500 to Herb Davies, for Flemming. He left the specimens with Fry as security for a loan in October or November, 1928, but explained Flemming authorized him to use the ore as security. Defendant and his wife were friends of Flemming for years and had aided him in affliction. When he was ill, in November, 1928,

defendant stopped to take him in a car to Boise, but he died en route.

The defendant did not know whether the ore came from Flemming's ground. He thought it possibly came from his upper workings, where there were three openings, but it was only a surmise. He had been in some of them.

Scott and the defendant met at the Lyndale rooms in Boise. Defendant did not want to go to Salt Lake, suggesting they await excursion rates. But Scott had to go north to look after his placer ground. He suggested the trip to Salt Lake and bought the tickets. He had their handbags containing the ore. Defendant admitted introducing Scott to Amos Mills as Emmerson to see if Mills would recognize him when dressed up. Scott thought it quite a joke. He also introduced Scott as Emmerson to Fry. Defendant registered his name as Murphy at the Wilson Hotel in Salt Lake, at Scott's suggestion. After breakfast defendant stayed in his room. About ten minutes before the arrest, Scott called him and said: "Are you there Murphy?" Defendant answered, "Yes." Then the officers came. Defendant's grip containing sixteen specimens was the only one in the room. The other four were in Scott's grip. One of the specimens in Scott's possession was exhibited in court. There has been no accounting for the rest.

Twenty specimens were wrapped to be brought to Salt Lake City, including "Big Boy." Only seventeen were in court. One piece was exhibited by Scott. Three quartz specimens and 34 ounces of placer nuggets were missing. Two of the latter were given to Mrs. Cahill by Flemming. Defendant last saw the nuggets when he delivered them in a grip to Scott on Granite creek. He delivered the "Big Boy" to Scott about July 5th, and the other specimens about July 17 or 18, at Flemming's tunnel, near Kueh's cabin.

Defendant admitted riding in the car with French and Scott. He said he paid Sanders at the ranch $152 which he owed him, but there was no jar of ore. The next night in Scott's room he offered to buy a nugget from defendant for $350 for resale to the Denver buyer. Defendant asked $400. Scott offered to sell it at Denver, to which defendant assented. Scott finally bought it and another for $525, reporting he got $600 for them. He bought at Quartzburg the placer nuggets for $40. He also bought an ounce of gold for which he paid Mrs. Cahill. Two

more specimens were sold to Scott which he in turn sold for $200 at Salt Lake.

Defendant denied stating the specimens came from the Belshazzar mine. On one occasion he said: "They might have come from the Gold Hill or the Belshazzar, or the Mountain Chief or from Hongkong, China." He did not recall the statement to Brassey. He admitted writing the letters to Scott, but denied he wrote the letter to Ballard. There were explanations, on cross-examination, tending to exonerate defendant from sinister design.

Early in March, Scott met defendant and suggested he grind his specimens in Scott's mill. He declined, saying they were worth more as bullion. He had received the map at Kuch's cabin. There was talk about a lease on the Belshazzar mine. Scott asked him if there was ore there. Defendant replied he knew where there might be a good chance and offered to "go 50-50," if Scott should get the lease. It was the lease referred to in their correspondence.

Defendant saw Scott at the latter's house after his return from Butte. Scott said he had some placer diggings up north on which he had to make a payment of $1,000. Scott mentioned the specimens and said he would meet the defendant at Kuch's cabin. The conversation there was about the big piece of ore. Scott christened it "Big Boy." A night or two later defendant delivered it to him. Defendant next saw it at the Wilson Hotel in Salt Lake. The other nineteen specimens were delivered to Scott in July at Flemming's tunnel, when Scott gave him $200 to pay for the two pieces delivered to Scott the day after "Big Boy" was delivered. There was talk of the trip to Salt Lake.

The defendant's wife also gave her testimony. It may be summed up as coinciding with his account; her knowledge of the transactions being claimed from her frequent presence when they occurred.

██ There was evidence bearing upon the identification of the ore as a product of plaintiff's mine. An assistant in the United States Assay Office at Boise determined the gold and silver contents of a sample taken from the second largest piece of ore in evidence, and, comparing the results with the assay of ore theretofore received from the plaintiff's mine, found them to be of the same character and grade; their similarity consisting of the large amounts of gold crystallized in arseno-pyrite. Ballard, an experienced field geologist and mining engineer, testified typical specimens of ore could be identified, and the ore in dispute came from that mine, giving special reasons for his opinion. Two experts with special education and experience, testifying for the defense, declared the ore could not be identified from examination. A professor of geology and mineralogy in the University of Utah, also highly qualified and experienced, after inspecting ore produced from plaintiff's mine and the ore in evidence, pronounced them very much alike, and said they had the same general characteristics and association and were very highly suggestive of the same type of mineral solution. The foregoing testimony should be considered, however, with the facts and circumstances otherwise shown.

There was further testimony of Mr. Ballard that he had examined the Flemming ground and found it outside of the sheer zone of the Boise Basin.

██ Our views of the evidence may be briefly stated. If the testimony of Scott is credited, it goes far toward making out appellant's case. Certainly, his interest supposed to arise from employment by appellant to bring the depredations of Cahill to light is insufficient to discredit him. We regard him as a trustworthy witness. He is corroborated by an array of circumstances, the letters of Cahill, including the anonymous communication sent to Ballard which we think the defendant wrote, the testimony of Brassey and Fry, the concealment of his identity, his scheme to lease the mine, his secretion of ore discovery in the mine, and his dominion over the ore he possessed before he claimed title to it. It is true the admissions imputed to him should by familiar rule be cautiously accepted. But they comport with his apparent confidence in the witnesses and the boastful spirit of his letters. Besides, he gave an improbable story to account for his possession of the ore. Its source would have been immaterial, under other circumstances. But in this case a better showing of Flemming's ownership was demanded. We think the truth is Flemming never owned the ore or gave it to him. The identification of the ore was quite sufficient, when considered as it should be along with the other evidence.

We find from the entire evidence in this case that Cahill when employed in the Belshazzar mine secretly appropriated the ore in dispute therefrom and made away with it, and that it is appellant's property.

The decree of the District Court is therefore reversed, and the cause is remanded to

that court, with direction to enter another, awarding the title to the ore in dispute and the possession of it to appellant, and taxing all costs of the suit to appellee Cahill, except the costs on McCarthy's answer, which will stand taxed to appellant.

Reversed.